**Kyriaki Cleo KYRIAZI, Plaintiff,**

v.

**WESTERN ELECTRIC CO. et al., Defendants.**

Civ. A. No. 475–73.

United States District Court,
D. New Jersey.

Feb. 21, 1979.

As Amended March 6, 1979.

---

Vladeck, Elias, Vladeck, Zimny & Englehard by Judith P. Vladeck, New York City, for plaintiff.

Pitney, Hardin & Kipp by Edward P. Lynch, S. Joseph Fortunato, Barry A. Guryan, Claire B. Dubin, Morristown, N. J., for defendants.

## OPINION

STERN, District Judge.

At the conclusion of "Stage I" of this Title VII litigation—the liability phase—this Court found that Western Electric discriminated against its female employees, applicants and former employees in the areas of hiring, promotion, participation in job training programs, layoffs, wages and opportunities for testing.[1] We now enter "Stage II", the damage phase. Stage II requires adjudication of the claims of thousands of class members.[2]

To assist it in this formidable task, the Court has appointed three Special Masters pursuant to Rule 53(a) of the Federal Rules of Civil Procedure. The Court now addresses some of the procedural hurdles which confront it at this stage.

### 1. Burden of Proof

■ The Supreme Court has made clear that once there has been a finding of class-wide discrimination, the burden then shifts to the employer to prove that a class member was not discriminated against; that is, a finding of discrimination creates a rebuttable presumption in favor of recovery.

1. That opinion is reported at 461 F.Supp. 894 (D.N.J.1978). An earlier opinion of this Court on the discovery aspects of Stage I is reported at 74 F.R.D. 468 (D.C.1977).

2. Western reports that there are approximately 10,000 class members (Tr. 1/31/79 at 5), of which:

The Court first addressed this in *Franks v. Bowman*, 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976) in which it held that:

> [P]etitioners here have carried their burden of demonstrating the existence of a discriminatory hiring pattern and practice by the respondents and, therefore, the burden will be upon respondents to prove that individuals who reapply were not in fact victims of previous hiring discrimination.

More recently, in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361–2, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977), the Court specifically rejected the contention that in the remedial stage of a pattern-or-practice case, the government must prove that the individual was actually the victim of discrimination:

> That basic contention was rejected in the *Franks* case. As was true of the particular facts in *Franks*, and as is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking.
>
> The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved dis-

—1,131 are retired
—1,887 are active employees
—3,200 were laid off by Western
—3,500 were rejected by Western.
(Tr. 1/31/79 at 9–10).

crimination. As in *Franks*, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

(Footnote omitted; citation omitted).

▆ Accordingly, the sole burden upon class members will be to demonstrate that they are members of the class, that is, that now or at any time since June 9, 1971, they were either employed by Western, applied for employment at Western or were terminated by Western. In practical terms, this will be reflected in the Proof of Claim forms which class members will be required to fill out. Those forms require only that the putative class member state the dates of her employment and/or application, the positions she held and/or sought.[3] The Court will not require individual class members to specify the manner in which they were discriminated against. As was held in Stage I, employees remained for the most part ignorant of the fact that they were being passed over for promotion and training programs, and unsuccessful applicants may well be unaware that they were rejected on the basis of their sex. The fact is that employment decisions are rarely put in discriminatory terms, no matter how discriminatorily bottomed. Individual employees should not be put to the almost impossible task of delving into the corporate consciousness to demonstrate how an already proven policy of discrimination exactly impacted each one of them.[4] Thus, once an individual demonstrates that she is a class member, the burden will then shift to Western to demonstrate that the individual class member was not the victim of discrimination.

### 2. Notice

▆ Pursuant to Rule 23(d)(2), Federal Rules of Civil Procedure, Western is required to give notice to class members in the following manner. All class members whose addresses are known to Western will be sent a notice and Proof of Claim form together with a prepaid envelope. The remaining class members will be notified by publication in six local newspapers for two consecutive weeks in the Sunday editions and three weekday editions.[5] All costs of notification are, of course, to be borne by Western. *See Love v. Pullman*, 13 FEP Cases 423 (D.Col.1976); *Sledge v. J. P. Stevens & Co.*, 18 FEP Cases 259 (E.D.N.C. 1976); *English v. Seaboard Coastline RR Co.*, 12 FEP Cases 90 (S.D.Ga.1975); and *Meadows v. Ford Motor Co.*, 62 F.R.D. 98 (W.D.Ky.1973).

▆ The Court has scanned the early returns from the newspaper notices and the mailings and has determined that it would be advisable to supplement the notice to the nearly 1,900 class members who are presently employed by Western by providing an opportunity for class counsel to communicate with them directly at the plant.[6] Ac-

---

3. Copies of the notice to the class and the Proof of Claim forms to be distributed to class members are reproduced in the Appendix to this opinion.

4. *Compare Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259 (5th Cir. 1974), which held that each class member has the "initial burden . . . to bring himself within the class and to describe the harmful effect of the discrimination on his individual employment position." It is noteworthy, however, that *Pettway* was decided before the Supreme Court's decisions in *Franks* and *Teamsters*.

5. Those newspapers are *The* New York *Times*, *The* Daily *News*, *The* Newark *Star Ledger*, *The* Bergen *Record*, *The* New York *Post*, and *The* Jersey *Journal*.

A substantial number of class members, approximately 3,500 are women who applied for positions at Western and were rejected. Western reports that it does not have the addresses of these women, only their social security numbers. Counsel for the plaintiff has been directed to prepare a form of notice acceptable to the Social Security Administration to be forwarded to the last known business addresses of these women.

6. In this Circuit, counsel is permitted to confer with members of the class—indeed, a restriction upon counsel's ability to communicate with class members has been held violative of the First Amendment. *Coles v. Marsh*, 560 F.2d 186 (3rd Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977); *Rodgers v. United States Steel Corp.*, 508 F.2d 152 (3rd Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46

cordingly, Western will permit counsel for the class to enter the plant for the purpose of meeting with class members who are presently employed by Western. Western may accomplish this in any manner that will minimize loss of productivity and disruption of its normal activities, provided that the manner selected gives employees advance notice and a reasonable opportunity to meet with counsel. Undoubtedly, mass meetings will be required in order to minimize the number of visits which counsel will have to make. These meetings may take place before or after working hours, if Western prefers, but sufficient time must be allocated and a suitable facility must be provided. With these guidelines in mind, counsel are directed to meet and work out a schedule which will commence not later than March 12, 1979 and terminate not later than March 31, 1979, nine days before the April 9, 1979 cutoff date for the filing of claims by class members.

### 3. Computation of Back Pay Awards

The courts have adopted a number of approaches in connection with the computation of back pay awards.[7] One approach, the "pro rata" formula referred to in *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974), and *United States v. United States Steel*, 520 F.2d 1043 (5th Cir. 1975), looks to the difference between the salary of the class members computed collectively and that received by employees of comparable skills and seniority, not the victims of discrimination. The class member then receives his pro rata share of that collective difference, based upon his salary differential and the number of competitors for the position. Another approach is the "test period" approach, used in *Bowe v.*

*Colgate, Palmolive Co.*, 489 F.2d 896 (7th Cir. 1973), in which the court awards class members the difference between the pay they receive after implementation of the Title VII decree and the pay they received while the discriminatory policies were in force. A variation of the "test period" approach was used in *Stewart v. General Motors*, 542 F.2d 445 (7th Cir. 1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977), in which the court awarded the class members the difference between the wages of salaried white workers during a test period and that actually received by the class. Yet another approach was used in *Stamps v. Detroit Edison Co.*, 365 F.Supp. 87, 121 (E.D.Mich.1973), *rev'd on other grounds sub nom. EEOC v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975), in which the court awarded class members the difference between their own actual earnings and the earnings of the skilled trade opportunity jobs from the effective date of Title VII.

The Court finds none of these approaches appropriate here. As we found in connection with Stage I, we deal with discrimination which manifests itself in a number of ways. For example, a woman might initially be hired at the lowest grade —32—while a comparable male would have been hired at grade 33. During the course of a ten-year period, the woman—perhaps unbeknownst to her—would be passed over for promotion, denied entry into job training programs and, finally, notwithstanding her seniority, would be the first to be laid off because she was in the lowest job category. She may in fact have been laid off and rehired a number of times.[8] By contrast, the male, during the same period and having started at a higher grade, would be

L.Ed.2d 50 (1975). *See also, Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1317, 1592–1604 (1976).

**7.** The back pay period commences two years before the filing of the EEOC charge. 42 U.S.C. § 2000e–5(g). At Stage I, the Court concluded that the nature of the discrimination alleged and proved brought this case within the "continuing violation" theory of Title VII, therefore, allowing class members to secure relief for acts

of discrimination occurring since the effective date of Title VII. While it is clear that the back pay award is statutorily limited, the Court is considering what other forms of relief may be awarded for discrimination which occurred before the two year back pay period.

**8.** The preliminary responses already received from class members indicate that this is no rare experience for women at Western.

promoted several grades—perhaps even trained for a supervisory position—and would thus remain unscathed in times of layoffs. It is, therefore, apparent that a back pay award must take into account the fact that a male and a female entering Western with comparable skills would, over a period of time, take dramatically divergent paths.

■ While this approach will not yield an exact measure of damages, neither could any other approach. However, the law is clear that where one has been damaged by the wrong of another, the victim is not to be denied any recompense merely because the exact measure of damages is uncertain. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Hairston v. McClean Trucking Co.*, 520 F.2d 226 (4th Cir. 1975). The approach we adopt at least gives individual consideration to each claimant and, if not precise, it is no more imprecise than lumping claimants into groups and extracting averages, or otherwise depersonalizing victims of discrimination by running them through a mathematical blender.

Moreover, Western itself objects to any formula type or averaging approach in awarding back pay—that is, to any but an individual approach under which the merits of each woman's claim is separately considered. (Reply Brief at 7–11). In the face of Western's objections, it may be that due process considerations require that any award to an individual be on the merits of that individual's case. *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 267 (5th Cir. 1974) (Bell, J., concurring.) In any event, it does seem that an individual approach is more fair both to class members and to Western.

■ In its proposed Order of Reference, Western proposes that:

45. If there is more than one eligible claimant for a given designated vacancy, net back pay awards shall be computed for each claimant. One award shall be made in an amount equal to the highest individual net award. Each claimant shall share that award in the proportion that her individual net back pay award bears to her total of all claimants' net back pay awards pursuant to the formula set forth in *United States v. United States Steel*, 520 F.2d 1043 (5th Cir. 1975).

The Court rejects this approach. According to Western, if there were three women who should have been considered for one promotion and none were, and if we cannot now determine which of the three women should have received the promotion, then each one receives one-third of the benefits. As Western notes, this approach does shield Western from having to pay three increases when only one was actually possible, but it also unjustly penalizes the one woman who was entitled to *all*—not just one-third—of the benefits of that promotion. Under Western's approach, two of the claimants get a windfall while the actual victim receives only one-third of the back pay to which she is statutorily entitled. If we know that all three claimants were discriminated against in that they were not considered for promotion but that only one—which, we do not know—would have actually received the promotion, then all three should get the full benefit of the promotional opportunity. Where it is proved that an employer unlawfully disregarded women for promotion, it is better that it pay a little more than to permit an innocent party to shoulder the burdens of the guilty. Western *will* be permitted to demonstrate that the promotion would have gone to one class member, rather than the others. However, if Western cannot demonstrate which claimant would have received the promotion, Western cannot divide the benefits of the one job. It is no more unreal to construe three promotions out of one, than to divide the salary increase of one promotion among three prospects. Either smacks of some artificiality but the latter protects the wrongdoer at the expense of the innocent.

The Order of Reference to the Special Masters is reproduced in the Appendix. Among other requirements, in an effort to assure back pay awards on as individualized basis as possible, where appropriate class members will be compared to the male em-

ployee with comparable skills upon initial hire and comparable seniority. The class member will then be awarded the difference between her salary and that received by the male counterpart, including bonuses and any other fringe benefits. *See Pettway v. American Cast Iron Pipe Co., supra.*

### 4. Compensation of Special Masters

The final problem which confronts us at the outset of Stage II is the compensation of the Special Masters.

All parties have recognized that the number of potential claimants virtually mandates the appointment of Special Masters. The parties agree that if any significant portion of the 10,000 potential claimants respond, the existing court mechanism of a district judge and a magistrate is totally inadequate to deal with the issues which will confront the Court. Even 3,000 claimants out of the 10,000 eligible, for example, would exceed the yearly civil filings for this entire district of nine active judges and five magistrates. Moreover, unlike a rough sampling of the typical civil case cross section, many of which will be voluntarily dismissed, others of which will be settled without any judicial supervision, and the overwhelming majority of which will be settled without any judicial factfinding,[9] it appears that each one of the claims of Western's present or former employees will have to be individually considered and adjudicated. Western has objected to any formula approach, and has requested that each claim be considered upon its own merits. The Court agrees that not only is Western entitled to this approach, but that each claimant is also entitled to individual consideration. In many instances this approach requires that efforts be made to project the actual benefits lost by each Western employee who has been found to have been a victim of Western's discrimination. Whole work histories will have to be recast, based on evaluations of the background, education, potential and abilities of each claimant, as compared with the opportunities

available to and realized by similarly situated males at Western. In a very real sense, Stage II proceedings under this approach resemble a host of individual cases, sharing many common questions of law and fact, as much as it does the pure class action of more common experience.

Faced with this task, the parties agree not merely to the appointment of a Special Master, but to the appointment of three Special Masters. The parties also agree that these Special Masters should not only be lawyers, but experienced trial lawyers. Western has demanded, and the Court has granted, an opportunity for it to conduct "discovery regarding the . . . claims pursuant to the Federal Rules of Civil Procedure." If the past is any gauge of the future, the Special Masters will be occupied with discovery matters concerning many hundreds of claimants even before they get down to dealing with the merits of each.

Western suggests, citing *Newton v. Consolidated Gas,* 259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844 (1921), that the Special Masters' compensation should be keyed to the salary of a district judge, if not a magistrate. Thus, Western suggests that the Special Masters be compensated at a rate between $30 and $40 an hour.

Because of the complexity of the task they assume—which will include not only the computation of back pay, but also discovery disputes and fact-finding—the Court finds that it is in the best interests of the class members to appoint attorneys well known for their integrity, service to the community, and litigation skills and experience. In order to justify this imposition upon their time, the Court finds that it must compensate them in a manner comparable to what they receive in their private practices, and not to limit them to the salary of a judge, who has no overhead costs, no staff to pay, whose retirement is paid, and so forth. And, while in the more typical case an attorney who served as Special Master should expect to receive at least some of

---

**9.** In 1978, approximately 90% of the civil actions filed in this District were terminated some time prior to trial. *Management Statistics for United States Courts* (1978).

his compensation in the honor of his selection and service, this is not the typical case. The Special Masters here will have to devote a substantial amount of time for an unforeseeable future in order to provide the individual consideration wanted and required.

The question of the compensation of Special Masters received extended discussion in *Newton v. Consolidated Gas Co., supra.* In that case, the Supreme Court reversed as excessive the district court's award of fees to a special master, noting that, while normally such matters were within the discretion of the district court, the award of excessive fees would be deemed an abuse of discretion. The Court went on to hold that the proper compensation should be keyed to public salaries with a premium to attract persons of high caliber from the private sector:

> His compensation should be liberal, but not exorbitant. The rights of those who must ultimately pay must be carefully protected; and while salaries prescribed by law for judicial officers performing similar duties are valuable guides, a higher rate of compensation is generally necessary in order to secure ability and experience in an exacting and *temporary* employment which often seriously interferes with other undertakings.

*Id.,* at 105, 42 S.Ct. at 439. (Emphasis added)

Since the *Newton* decision, the question of the compensation of special masters has received little discussion: some courts have approved the award of fees which appear to be roughly comparable to that which is earned in private practice; *see, e. g., American Safety Table v. Schreiber,* 415 F.2d 373 (2nd Cir. 1969) (approving rate of $40 per hour—in 1969); *Chesa International v. Fashion Associates,* 425 F.Supp. 234 (S.D.N.Y.1977) (fee of $100 an hour), while others have awarded a somewhat lower rate, *see, e. g., Hart v. Community School Board of Brooklyn,* 383 F.Supp. 699 (E.D.N.Y.1974), *appeal dismissed* 497 F.2d 1027 (2nd Cir. 1974) (fee of law school professor in school desegregation case to be about half that charged by attorneys in private practice, but all overhead costs paid).

The Court finds that it is in the interest of all the parties—particularly the class members—to compensate the Special Masters in a manner roughly comparable to that which they receive in the practices from which they are being diverted. The Court cannot be blind to the fact that the path ahead of the Special Masters is a thorny one—one that will include complex questions of damage, difficult and tedious discovery disputes, hearings and fact finding. Further, the Special Masters will necessarily be diverted from their own practices, losing not only present business but also the future business which a successful attorney-client relationship ensures. While it is true that the Supreme Court—in 1922—suggested that special masters in "temporary" employment, are to be compensated only slightly in excess of the salaries received by public officials, the Court finds this goal no longer viable given the realities of the current practice of law, and that which faces the Special Masters here is no temporary endeavor. Months, if not years of arduous work lie ahead, and Western's suggested compensation for the trial lawyers it wishes as Special Masters is less than what many firms in this area bill for paralegal clerical employees.

Accordingly, the Court will compensate the Special Masters as follows: an hourly rate of $125 will be awarded Bernard Hellring, Esquire, who has been designated the "Administrative" Special Master; and an hourly rate of $115 will be awarded the two other Special Masters, Thomas F. Campion, Esquire and Bruce I. Goldstein, Esquire. This is less than what they would usually bill for such a service—as Western does not dispute—but these three members of the Bar have indicated their willingness to take less, notwithstanding the protracted nature of the proceedings, as a part of their obligations as members of our Bar.

The fees will be paid at designated intervals and will be borne by the defendant. *See Stastny v. Southern Bell Tel. & Tel. Co.,* 458 F.Supp. 314 (W.D.N.C.1978).

Appendix "A"

TO: Female Applicants, Employees or Former Employees of Western Electric's Kearny Plant (including the Clark Shops)

RE: Sex Discrimination Action Against Western

If you are a woman and now or any time since June 9, 1971 you either: (a) applied for employment at Western's Kearny plant and were rejected; or (b) were employed in any position at Western's Kearny plant; or (c) were laid off or discharged from any position at Western's Kearny plant, please read this notice carefully.

On October 30, 1978, in a lawsuit brought by Kyriaki Cleo Kyriazi, a former employee of Western, the United States District Court for the District of New Jersey found that Western has been discriminating against its women employees at its Kearny plant in violation of federal law. It was found that women, *as a group,* were discriminated against in the following ways:

1) *Hiring*—Women are hired into the lowest grades, while men with equal skills and experience were hired into the higher grades.

2) *Promotion*—Women employees were not given promotional opportunities equal to male employees.

3) *Layoffs*—Women were not treated fairly when employees had to be laid off.

4) *Transfer into Kearny*—Women who transferred into the Kearny plant were placed in lower grades than they were in before they transferred.

5) *Discharge*—More women were fired than men.

6) *Participation in Job Training Programs*—Women were not given the opportunities given to men to participate in job training programs.

7) *Opportunities for Testing*—Women were not given the opportunity to take tests for promotion to better positions.

The Court has completed the first stage of this lawsuit by finding that Western had discriminated against women in its Kearny plant. Copies of the Court's opinion are on file in the United States District Court of the District of New Jersey.

There will be soon be a second stage, "Stage II", at which time the Court will determine the damages and other relief which it will award to individual women. If you are or were at any time since June 9, 1971 an employee of Western, or if you ever applied for a position at Western, you may be entitled to certain benefits, including monetary payments. The "Stage II" proceedings will determine this question. At these "Stage II" proceedings, any eligible woman will be presumed to have been discriminated against. It will be Western's duty to show that it did not deny a woman employment opportunities because of her sex. If Western fails to demonstrate this, that women will be entitled to recovery, which may include back pay and reinstatement.

If you wish to be considered, you must fill out the enclosed form. Your claim will not be considered if you do not do so and return the form by April 2nd, 1979. If you do fill out the form, you may be required, with no cost to yourself, to participate in court proceedings. You will be furnished an attorney without cost to you. That attorney will be Judith Vladeck, Attorney for plaintiff Kyriazi. If you prefer, you may retain an attorney of your own choosing. If you wish further information, you may contact the attorney for the plaintiff, Judith Vladeck, at (212) 354–8330

AS PART OF THE COURT'S ORDER, YOUR EMPLOYER MAY NOT PENALIZE YOU IN ANY WAY IF YOU CHOOSE TO FILE A CLAIM AGAINST IT.

APPENDIX "B"

<u>Kyriazi v. Western Electric</u> 475–73

_____
NAME

_____
ADDRESS

_____
TELEPHONE NUMBER

Answer each question to the best of your ability.

1) Did you use any other name while employed at Western's Kearny Plant? (Indicate yes or no) _____. If so, please set forth the names you used and the dates you used each name.

| <u>NAME</u> | <u>DATES</u> |
|---|---|
| _____ | _____ - _____ |
| _____ | _____ - _____ |

2) What is your social security number? _____

3) Were you rejected for a position at Western's Kearny Plant? (Indicate yes or no) _____. If so, please set forth the date of your application and the position for which you applied. _____

_____

4) Are you presently employed at Western's Kearny Plant? _____ If so, when did your employment begin? _____
Please list all positions you have held at Western, (the grade, if the position was graded), and the dates you held each position.

| <u>POSITION</u> | <u>GRADE</u> | <u>DATES</u> |
|---|---|---|
| _____ | _____ | _____ - _____ |
| _____ | _____ | _____ - _____ |
| _____ | _____ | _____ - _____ |

5) Were you laid off or otherwise terminated by Western? _____. If so, when did your employment end? _____. What was the reason given for your termination? _____. Set forth each of the positions you held at Western's Kearny plant and the dates you held each position.

| | |
|---|---|
| _____ | _____ - _____ |
| _____ | _____ - _____ |
| _____ | _____ - _____ |

6) Have you been employed since you left Western? _____. If so, please set forth the positions you have held since you left Western and the dates you held each position.

| | |
|---|---|
| _____ | _____ - _____ |
| _____ | _____ - _____ |
| _____ | _____ - _____ |

Please send the completed form to:

Angelo Locascio, Clerk
United States District Court
U.S. Post Office and Courthouse
Newark, New Jersey 07101

## ORDER OF REFERENCE AND GUIDE-LINES FOR SPECIAL MASTERS

### Appendix "C"

Pursuant to Rule 53(b) of the Federal Rules of Civil Procedure,

It is on this 21 day of February, 1979,

ORDERED that these cases are hereby referred to Thomas F. Campion, Esquire; Bruce I. Goldstein, Esquire; and Bernard Hellring, Esquire, as Special Masters to conduct proceedings and determine which of the members of the class are eligible to receive back pay, to calculate the amount of back pay to be awarded, and to take any and all such other actions as are specified and directed as set forth herein.

The Special Masters are specifically granted all necessary authority and empowered to achieve the aims embraced within the intent and purpose of this Order of Reference including but not limited to the right to hear all discovery motions, hold hearings, and administer any and all such other actions as may be necessary to carry out their duties in meeting their obligations to this Court.

Upon the conclusion of said proceedings, the Special Masters shall, pursuant to Rule 53(e), submit to this Court for consideration a Report setting forth findings of fact, conclusions of law and recommendations for relief.

### GUIDELINES

1. The class of women eligible to file their claims and have them adjudicated are:

all females who are now or at any time since June 9, 1971, have been employed by defendant Western Electric Company, or sought employment with said Company during the pendency of this suit, at the Kearny Works Organization.

2. This Court has ordered that class members be notified of their eligibility to present claims and participate in hearings before the Special Masters pursuant to this Order of Reference by a "Notice to Class" approved by this Court. The Notice requires all class members who seek to pursue their claims to fill out a "Proof of Claim" form, approved by this Court, certifying in writing that they are members of the class and that they will pursue their claims. It also requires the class members to answer questions concerning each claim. These Proof of Claim forms must be filed with the Clerk of the Court not later than April 9, 1979.

3. The Special Masters are directed to exclude from consideration those females who do not file Proof of Claim forms within the time provided, unless applicant shows good cause which shall not include 'neglect.

4. The Special Masters shall file and serve on the parties a complete list of those class members whose claims are included and those who are excluded and the reason for each individual exclusion.

5. Western shall be permitted to engage in discovery regarding the remaining claims pursuant to the Federal Rules of Civil Procedure. The Special Masters shall rule on all discovery motions made with regard to the claims assigned to them.

6. The claims shall be assigned among the Special Masters by Bernard Hellring, Esquire, who shall serve as Administrative Special Master.

7. Thereafter, the Special Masters shall conduct hearings upon the claims and make findings of fact, conclusions of law, and recommendations for relief in accordance with the guidelines set forth below. All findings shall be subject to review by this Court.

8. The Special Masters shall develop a schedule for the hearing of claims as well as for discovery with respect to the various claims. The schedule shall provide for the completion of discovery with respect to any particular claim sufficiently in advance of hearing on that claim, and for discovery with respect to claims to be heard in the

future to proceed concurrently with the hearings on other claims.

9. Each claimant must make out a *prima facie* case. To make out a *prima facie* case, an individual must establish that she is a member of the class during the period in controversy. The Special Masters shall modify the following guidelines with respect to burdens of proof where appropriate upon motion by either party.

### HIRING CLAIMS

10. In order to make out a *prima facie* case with regard to hiring, a claimant must prove:

1. On or after June 9, 1971 she applied for employment with Western; and

2. a) was not hired; or

 b) was hired into a lower graded job than some other position for which she was qualified.

11. If the claimant establishes her claim, the burden shifts to Western to rebut the claims:

a. That the individual was not hired by demonstrating:

1. There were no vacancies; or

2. The claimant was not qualified for any vacant positions; or

3. A woman was hired to fill the vacancy; or

4. A man better qualified to perform the work was hired; or

5. The claimant refused offers of employment; or

6. The claimant was not hired for reasons other than sex discrimination; or

b. That the individual was hired into a lower graded job than she was qualified for by demonstrating;

1. There were no vacancies in such position; or

2. The claimant was not qualified for such position; or

3. A woman was hired to fill the vacancy; or

4. A man better qualified to do the work was hired; or

5. The claimant refused higher graded positions; or

6. The claimant was not hired into a higher graded position for reasons other than sex discrimination.

12. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for failing to hire her or hiring her into a lower graded job than the position she was qualified for is, in fact, a pretext for sex discrimination.

13. If Western fails to meet its burden,

a. the individual who establishes that she should have been hired shall be awarded retroactive seniority to the date she should have been hired, and placement on the Priority Hire List as set forth in paragraphs 40–41.

b. the individual who establishes that she should have been hired into a higher graded job shall be awarded back pay computed as directed in paragraphs 42–47.

### PROMOTION CLAIMS

14. In order to make out a *prima facie* case with regard to promotion, a claimant must prove:

1. On or after June 9, 1971 there were promotional opportunities available and that she was not promoted.

15. If the claimant establishes her promotion claim, the burden shifts to Western to rebut the claim by demonstrating;

1. there were no promotional opportunities available; or

2. the claimant was not qualified for promotion; or

3. a woman filled the vacancy; or

4. a man better qualified to perform the work filled the vacancy; or

5. the claimant refused opportunity for promotion; or

6. the claimant was not promoted for reasons other than sex discrimination.

16. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for failing to promote her is, in fact, a pretext for sex discrimination.

17. If Western fails to meet its burden, the claimant shall be awarded back pay computed as directed in paragraphs 42–47.

TRANSFER CLAIMS

18. In order to make out a *prima facie* case with regard to transfers, the claimant must prove;
 1. on or after June 9, 1971 she transferred into the Kearny Works Organization; and
 2. she was transferred into a lower graded job than she held immediately prior to transfer, or a lower graded job than she was qualified for at the Kearny Works Organization.

19. If the claimant establishes her claim, the burden shifts to Western to rebut the claim that the individual was transferred into a lower graded position than she held immediately prior to transfer or than she was qualified to hold by demonstrating:
 1. no jobs were available in her prior grade;
 2. there were no jobs for which the claimant was qualified in her prior grade;
 3. the claimant turned down offers of a position in her prior grade;
 4. the claimant was denied a position in her prior grade for reasons other than sex discrimination; or
 5. the claimant was not given a higher graded job for reasons other than sex discrimination.

20. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for transferring her into a lower graded job than she held immediately prior to her transfer is, in fact, a pretext for sex discrimination.

21. If Western fails to meet its burden, the claimant shall be awarded back pay computed as directed in paragraphs 42–47.

LAYOFF CLAIMS

22. In order to make out a *prima facie* case with regard to layoff, a claimant must prove:
 1. she was laid off from a position at Western.

23. If the claimant establishes her claim, the burden shifts to Western to rebut the claim by demonstrating that the claimant would have been laid off in any event for nondiscriminatory reasons.

24. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for laying her off is, in fact, a pretext for sex discrimination.

25. If Western fails to meet its burden, the claimant shall be awarded (1) back pay computed as directed in paragraphs 42–47, taking into account as a set-off any severance pay or lay-off allowance paid to claimant as a result of her lay-off, and (2) if claimant is currently laid off, placement on the Priority Hire List as set forth in paragraphs 40–42.

DISCHARGE CLAIMS

26. In order to make out a *prima facie* case with regard to discharge, a claimant must prove:
 1. on or after June 9, 1971 she was discharged.

27. If the claimant establishes her claim, the burden shifts to Western to rebut that claim with evidence that the claimant was discharged for reasons other than her sex including, but not limited to, poor performance, excessive absenteeism or tardiness, misconduct, insubordination, violation of company rules, etc.

28. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for discharging her is, in fact, a pretext for sex discrimination.

29. If Western fails to meet its burden, the claimant shall be awarded retroactive

seniority to the date she was terminated, as set forth in paragraphs 40–41, and back pay as computed as directed in paragraphs 42–47.

## TRAINING CLAIMS

30. In order to make out a *prima facie* claim with regard to training programs, the claimant must prove:

1. on or after June 9, 1971 she was not given an opportunity to enroll in the Shop Staff Trainee Program, the Management Training Program or particular training courses at the Corporate Education Center in Princeton.

31. If the claimant establishes her claim, the burden shifts to Western to rebut her claim by demonstrating:

1. she was not qualified for the training programs or courses; or
2. there were no vacancies in the training programs or courses; or
3. the training programs or courses were not being given at the time she sought to enroll in them; or
4. the vacancy in the training programs or courses was filled by a woman or better qualified man; or
5. she refused opportunities to enroll in such training programs or courses, or that she would have refused; or
6. she was denied enrollment in such training programs or courses for reasons other than sex discrimination.

32. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for denying her admission into the particular training program or course is, in fact, a pretext for sex discrimination.

33. If Western fails to meet its burden, the claimant shall be entitled to an order directing Western to offer her the opportunity to enroll in the particular training program or course, which had previously been discriminatorily denied.

## TESTING OPPORTUNITIES

34. In order to make out a *prima facie* case with regard to testing a claimant must prove:

1. on or after June 9, 1971 she was not given the opportunity to take a particular test.

35. If the claimant establishes her claim, the burden shifts to Western to rebut the claim by demonstrating:

1. she was not qualified to take the test; or
2. the tests were not being given at any particular time she would have been eligible; or
3. she refused the opportunity to take the test, or would have so refused; or
4. she was denied the opportunity to take the tests for reasons other than sex discrimination.

36. If Western meets its burden by a preponderance of the evidence, relief shall be denied unless the claimant can prove that Western's reason for denying her the opportunity to take the test is, in fact, a pretext for sex discrimination.

37. If Western fails to meet its burden, the Special Master shall make a finding that the claimant should have been given the test and recommend that the claimant be given the test. The Special Master shall retain jurisdiction over her claim until the test is administered to the claimant and scored.

## RETROACTIVE SENIORITY

38. Once a determination that a claimant shall be entitled to individual relief has been made, a date representing the earliest date on which the claimant should have been hired into or promoted to the particular job in question, the date on which the claimant was transferred into the Kearny Works Organization, or the date on which the claimant was laid off or discharged shall be assigned. The date shall be termed the "designated date" for the claimant. An individual claimant may have more than one designated date in recognition of the fact it may have been established that she

had a valid claim for more than one job, or would have had a claim for a series of subsequent promotional opportunities had she received the earlier promotion which she had been discriminatorily denied.

39. The claimant shall be given retroactive seniority, where appropriate, to her designated date.

PRIORITY HIRE LIST

40. As to those applicants for entry level hire who were never employed by Western because of an initial discrimination against them, a Priority Hire List shall be established which lists all class members entitled to the first entry level vacancies available for each job. Class members shall be placed on the Priority Hire List for each job according to their respective designated dates. A similar Priority Hire List shall be established for all above entry level applicants who were discriminatorily turned away by Western and never hired. Such lists shall be maintained according to job category and class members shall be placed on each such List according to their designated dates.

41. Western shall undertake to make offers of employment to such claimants on the Priority Hire Lists as follows:

a. Selection for hire from the Priority Hire List shall be in chronological order of the designated dates for each job, beginning with the earliest designated date.

b. If there are multiple eligible claimants for hire into an entry level grade or for hire with a common designated date, such claimants shall be offered the available position in the order of their respective seniority with Western, if applicable, or with respect to date of application for hire, earliest first. As a last resort, alphabetical order shall be used. The offer to the most senior claimant among more than one claimant for a particular vacancy shall eliminate any obligation to make an additional offer to the other claimants for that vacancy.

42. As to members of the class who were discriminatorily laid off by Western, each such claimant shall be entitled to back pay from that date of the discriminatory lay off, "designated date", until the cutoff date, or until the date when that employee would have been laid off, absent the discriminatory practices of Western, whichever date is earlier. It shall be Western's burden to show that a date earlier than the cutoff date should be utilized.

43. As to members of the class who have been retired or who are still employed by Western, or who have been laid off by Western, the Special Masters shall, where appropriate, compute the amount of back pay to be awarded to a claimant as set forth below.

The term "back pay period" for each eligible claimant shall mean the period ending on the cutoff date and commencing on either January 9, 1970, or her "designated date", whichever date is later.

As noted in paragraph 38, a claimant may have more than one designated date, with respect to, for example, a second or third promotion, consideration for which was discriminatorily withheld because of a failure, based on discrimination, to award an earlier promotion. So, too, there may be claimants who have been discriminatorily laid off more than once and several times improperly denied promotional opportunities. The Special Master is to employ the following criteria:

a. As to class members who applied for employment at Western but were never hired, back pay shall be awarded from the date on which the position was open until such time as the applicant obtained another position or should have obtained other employment in the exercise of due diligence or the position ceased to exist, whichever is earliest. It shall be Western's burden to prove that a class member could have obtained other employment in the exercise of due diligence or that the position ceased to exist on a given date.

b. Employees who were discriminatorily laid off or fired, but who were not discriminated against as to promotion, shall be entitled to pack pay as described in paragraph 42.

c. As to any employee who was discriminatorily treated as to promotion, such a claimant, in addition to back pay as authorized by paragraph 42, *for that period while laid off,* shall be entitled to receive the back pay of the position which was discriminatorily denied. Such back pay means annual earnings, including straight time, required overtime, shift differentials and fringe benefits such as vacation.

44. If the Special Master can determine that, as to a particular promotion, that promotion would have gone to a particular claimant but for Western's discrimination, and that the particular claimant would, absent Western's discriminatory practices, have remained in that position for the rest of her career at Western, or until the cutoff date, back pay shall be computed accordingly.

However, if there is more than one eligible claimant for a given designated vacancy, and if the Special Master cannot ascertain which among several claimants but for Western's discriminatory practices would have or should have obtained the position, then every such eligible claimant shall be treated for back pay purposes as being entitled to that promotion. Similarly, with respect to applicants, where more than one woman applied for a position and if the Special Masters cannot ascertain who would have obtained the position—each woman shall be treated for back pay purposes as being entitled to the vacancy.

45. To the extent practicable, after the Special Master determines the effective date of such a promotion, the Special Master shall consider whether or not the claimant would then have been eligible for consideration for promotion to the next higher grade or grades. If so, and if the claimant has been found to have been discriminatorily denied a subsequent promotion by reason of ineligibility due to an earlier discrimina-

tory denial, then the Special Master shall assign the claimant an additional "designated date" or dates. The Special Master shall, to the extent practicable, analyze the work record of each claimant, her qualifications, the objective and subjective indicia of interest in promotion, as well as the promotional opportunities which actually would have been available to her absent discrimination in an attempt to reconstruct as fairly and accurately as possible what her progress would have been at Western if she had been given the same opportunities as the most nearly identical male was given. The Special Master should, in this regard, take into account the promotional vacancies available at each level of his inquiry and consider the caliber of the male and female competition which the claimant faced, or would have faced. The Special Master, should, if possible, designate a model drawn from a male employee who most nearly resembles the female claimant in terms of employment date, background and education and may use that model, to the extent it is helpful, in attempting to project the course which a claimant's career would have been expected to take had she been given the same promotional opportunities. In making an award of a "designated date" based on a discriminatorily denied promotion, whether the initial promotion beyond the claimant's actual grade, or a projection of subsequent promotions, the Special Master shall specifically indicate the promotional opportunity, which employee actually received that promotion, which employees should have been considered for it and, in making the award to a claimant, the basis of the selection, or, if more than one claimant is awarded the "designated date" indicated by that promotional opportunity, why it is not possible to pick only one claimant.

46(a). The term "back pay period" for each eligible claimant shall mean the period ending on the cutoff date and commencing on either January 9, 1970, or her designated date, whichever date is later.

(b). The "cutoff date" for back pay shall be the date of entry of final judgment in this case or the date on which the class

member has been restored to her rightful position at Western, whichever is earlier.

(c). From the designated date for each eligible claimant for each job involved, the annual earnings of the person who actually filled the designated vacancy for which the claimant has been determined eligible and qualified shall be calculated for the appropriate period. The annual earnings shall include straight time, required overtime, shift differentials, and fringe benefits such as vacation. If the employee who filled the designated vacancy did not occupy the position at the cutoff date, the comparative earnings shall be computed as if the employee remained in the position until the cutoff date. If there are unusual circumstances (such as extended illness) which tend to reduce the gross back pay figure, then a reasonable amount shall be determined.

(d). The claimant's income during the backpay period shall be determined. The claimant's income shall include salary actually earned or the amount she would have earned with reasonable diligence. This figure shall be subtracted from the gross back pay award.

(e). Western should be required to withhold from any back pay award appropriate amounts for federal, state and local taxes.

(f). In addition, the claimant shall be entitled to "front pay" for as long as the position continues or until she obtains the position from which she was discriminatorily excluded.

47. If back pay is awarded a claimant because she has established a right to a particular position, back pay will be cut off on the date Western can show that claimant would not have retained that position for reasons other than sex discrimination, e. g., work force reductions, layoff.

## JURISDICTION

48. The Special Masters shall retain jurisdiction over any claims for the purpose of administering the relief determined to satisfy such claim.