Kyriaki Cleo KYRIAZI, Plaintiff,

v.

WESTERN ELECTRIC CO. et al., Defendants.

Civ. A. No. 475–73.

United States District Court,
D. New Jersey.

Sept. 13, 1979.

Vladeck, Elias, Vladeck & Englehard by Judith P. Vladeck, Margaret M. Young, New York City, for plaintiff.

Pitney, Hardin & Kipp by Edward P. Lynch, S. Joseph Fortunato, Claire B. Dubin, Morristown, N. J., for defendants.

OPINION

STERN, District Judge.

This Court has held, in *Kyriazi v. Western Electric*, 461 F.Supp. 894 (D.N.J.1978),

that the defendant Western Electric discriminated against the named plaintiff in this class action, Kyriaki Cleo Kyriazi, and against women as a class,[1] in violation of Title VII. In addition, it found that the individual defendants, several of Kyriazi's co-workers, were liable to her under federal and state law.[2] The Court must now determine Kyriazi's remedy.

The facts of *Kyriazi*'s individual case, as found by this Court, together with the facts found in the class case, are set forth in *Kyriazi v. Western Electric, supra.* Briefly, as they pertain to the individual claim, they may be summarized as follows.

Kyriazi, a native of Greece, received a B.S. in Economics from the School of Economics in Athens, Greece in 1952. She emigrated to the United States in 1958. In 1961 she received a Master of Business Administration from Columbia University and in 1965 she received a Master of Industrial Engineering Degree, also from Columbia. She was hired by Western in 1965 as an engineer in the Information Systems field at Western's headquarters in New York, and was transferred to the Industrial Engineering organization of Western's Kearny plant in February, 1966. In May, 1967, she was promoted to the position of Industrial Engineer and in February, 1969, she was transferred to the Information Systems organization at Kearny, where she held the position of Information Systems Staff member. She remained in that capacity until she was fired on November 19, 1971.

■■■ As this Court observed of Western's treatment of Kyriazi in connection with the liability stage of *Kyriazi*'s individual case:

From the very first, Kyriazi's experience with Western was fraught with difficulties. . . . [T]he Court finds that upon her transfer to the Kearny plant, Kyriazi encountered the top-to-bottom discriminatory sex policies of Western; that she refused to function within the sex segregated role expected of an employee at Western; that she actively protested and rebelled against what she perceived to be the unfair treatment of women at Western; and that in return she was denied promotion, discriminated against by her superiors, unfairly denied salary increases, subjected to odious personal harassment by fellow workers and, finally, fired when, instead of complying with her employer's ultimatum that she seek psychiatric help, she formally complained of sex discrimination.

461 F.Supp. at 924–26. Accordingly, after resolving much of the conflicting evidence in Kyriazi's favor, the Court found that Kyriazi was underpaid, that she was harassed by her co-workers, that she was denied promotions—all on account of her sex—and that she was ultimately terminated by Western both on account of her sex and in retaliation for having lodged a formal complaint of sex discrimination. In addition, the Court found that the individual defendants, Kyriazi's supervisors and co-workers during the period in question, were liable to her under state law for tortious interference with her contract of employment based upon the odious personal harassment they inflicted on her during her tenure at the Information Systems organization at Kearny.[3]

---

1. The class as certified consists of all women who now or at any time since June 9, 1971, have been employed by Western's plant in Kearny, New Jersey, or who sought employment with Western's Kearny plant during the pendency of the action. Following a trial on liability alone, the Court found that Western discriminated against the class in such diverse areas as hiring, promotion, salary, participation in training programs and layoffs. The damage phase of the class action is presently pending before Special Masters appointed by this Court. *See Kyriazi v. Western Electric,* 461 F.Supp.

894 (D.N.J.1978); *Kyriazi v. Western Electric,* 465 F.Supp. 1141 (D.N.J.1979).

2. *See* note 3 and accompanying text, *infra.*

3. The individual defendants are Fred Wilser and Ralph Boyd, Kyriazi's supervisors in Information Systems; and James Snyder, Robert Armstrong and Shen T. Liu, her co-workers in Information Systems. The details of their behavior are set forth in 461 F.Supp. at 924–45, and are also discussed *infra,* in connection with her claim for damages under state law. The conduct of these individuals, together with

This Court has already found that Kyriazi is entitled to back pay from Western and to reinstatement at the level where she would have been had she not been the victim of discrimination. In order to determine the back pay due plaintiff, we must determine the course of her employment had Western not improperly fired her on November 19, 1971, and discriminated against her before that. As the Court found in connection with the liability stage of Kyriazi's case, Western computes salary on the basis of age, rank, and rating. This Court has previously addressed the manner in which damages are to be computed. The work record of each woman is to be evaluated. Each promotional opportunity which was or should have been available to her is to be considered where appropriate. Each woman is to be compared to the male employee most like her with respect to age, education and experience, in order to determine a suitable rating from which to compute seniority and salary. She will be awarded the difference between her actual salary and what a comparable male would have received. *Kyriazi v. Western Electric*, 465 F.Supp. 1141, 1145–47 (D.N.J.1979).

■ The Court has determined on the basis of evidence adduced at both stages of Kyriazi's individual case that the male most comparable to Kyriazi is her former co-worker in Information Systems, Shen T. Liu.[4] Both individuals emigrated to the United States as adults, and English is a native language to neither. Both received their bachelor's degrees from foreign universities, and their Master's degrees in this country (Kyriazi from Columbia; Liu from Rutgers). Both entered Information Systems organization at approximately the

---

Western's failure to take action against them, also served as a basis for liability under 42 U.S.C. § 1985(3) as that statute was then interpreted by the Court of Appeals for the Third Circuit in *Novotny v. Great American Federal Savings & Loan Association*, 584 F.2d 1235 (3rd Cir. 1978) (*en banc*). However, the Supreme Court has recently vacated that decision and held that 42 U.S.C. § 1985(3) may not be invoked to redress violations of Title VII. *Great American Federal Savings & Loan Association, et al. v. Novotny*, —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Accordingly, an order will enter vacating the liability of Western and the individual defendants under 42 U.S.C. § 1985(3).

The elimination of the federal claim against the individual defendants, however, does not deprive this Court of subject matter jurisdiction over the state law claims against them. Although the Supreme Court in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), held that there must exist an independent basis of subject matter jurisdiction as to each party, it carved out a possible exception in cases where one defendant *must* be sued in federal court:

> When the grant of jurisdiction to the federal court is exclusive . . . the argument of judicial economy and convenience can be coupled with the additional argument that only in federal court may all of the claims be tried together.

*Id.*, at 18, 96 S.Ct. at 2422. At least four Courts of Appeals have held, on the basis of this language in *Aldinger*, that there is pendent party jurisdiction over non-federal parties where one party is sued under an exclusive grant of federal jurisdiction. *See, Ortiz v. Unit-ed States*, 595 F.2d 65 (1st Cir. 1979); *Dick Meyers Towing Service, Inc. v. United States*, 577 F.2d 1023 (5th Cir. 1978) (*per curiam*); *Morrissey v. Curran*, 567 F.2d 546 (2nd Cir. 1977); *Transok Pipeline v. Darks*, 565 F.2d 1150 (10th Cir. 1977). At least two circuits have gone the other way. *See Kack v. United States*, 570 F.2d 754 (8th Cir. 1978); *Ayala v. United States*, 550 F.2d 1196 (9th Cir.), *cert. granted*, 434 U.S. 814, 98 S.Ct. 50, 54 L.Ed.2d 70 (1977), *cert. dismissed*, 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978). The Court of Appeals for the Third Circuit has not yet spoken on this issue.

This Court believes that the better view is that espoused by the majority of circuits thus far, that pendent party jurisdiction may be exercised, in appropriate circumstances, where the claim against one party is predicated upon an exclusive grant of federal subject matter jurisdiction. Any other course of action would seem to this Court a waste of judicial resources and a hardship upon the litigants. Accordingly, since the grant of subject matter jurisdiction here is exclusive as to Western, *see* 42 U.S.C. § 2000e (1976), and since the claims arise out of a "common nucleus of operative fact", the Court will exercise pendent party jurisdiction over the state claims against the individual defendants.

4. Thus, the Court adopts in substance Western's proposed finding # 13. We reject Kyriazi's proposed findings #'s 5–12 in which she urges comparison respectively to James Snyder, J. Meudt, R. Lear, H. Kardash and L. Gruber.

same time: Liu in 1968, Kyriazi in 1969; by May 1969, both were Staff members. Finally, both worked on the same project in Information Systems. Adjustments must be made to reflect that Kyriazi is approximately ten years older than Liu, and that she had been at Western for an additional three years. A comparison of the salaries of Liu and Kyriazi when both were employed at Kearny makes clear that Kyriazi's age and experience were not given proper consideration.[5] Although Kyriazi was rated lower than Liu, this Court has already held that such ratings must be disregarded where they are tainted with unlawful considerations:

> Where the evidence indicates that supervisors are conscientiously and fairly attempting such evaluations, their conclusions are entitled to great weight. Subjective perceptions will vary. A perfect evaluation is not required, even if it were attainable.
>
> But when, as here, an employee has demonstrated that her supervisors were unlawfully discriminating against her, then their ratings and rankings are no longer presumptively valid. It falls upon them, in such circumstances, and upon their employer, to demonstrate the *bona fides* of low rankings awarded by supervisors . . . No satisfactory evidence in support of the . . . evaluations of Kyriazi was offered to the Court by Western.

461 F.Supp. at 943.

Kyriazi's damages, therefore, will be determined as follows. During the period prior to Kyriazi's termination, she will be ranked the same as Liu except, of course, in those periods in which she received a higher rating.[6] The salary which Kyriazi should have received is that which Liu received, adjusted to reflect that Kyriazi was 9½ years older than Liu and three years senior in service, and at times had a higher rating. Her award for the period prior to her termination is the difference between the aggregate wages she would have received using this computation and her actual wages.

The Court notes, however, that while Liu is the most similar to Kyriazi within the small universe of males with whom Kyriazi worked while she was at Western, a continued comparison of the two after she left Western would be most unfair to Kyriazi. After Kyriazi's departure from Western in November of 1971, Liu's ratings dropped to "C". Apparently because of this decline in ratings, Liu was not promoted to Senior.

5.
RANK ORDERINGS

| DATE | | AGE | RANK | RATING | YEARS WITH WESTERN | MONTHLY SALARY |
|------|---|-----|------|--------|--------------------|----------------|
| 12/1/69 | Liu | 30 | 20th | N | 1 | $1045 |
| | Kyriazi | 39 | 29th | B | 4 | 1095 |
| 6/1/70 | Liu | 30 | 22nd | B | 1 | 1045 |
| | Kyriazi | 40 | 30th | C | 5 | 1095 |
| 12/1/70 | Liu | 31 | 20th | B | 2 | 1045 |
| | Kyriazi | 40 | 18th | B | 5 | 1095 |
| 12/1/71 | Liu | 33 | 28th | B | 3 | 1160 |
| | Kyriazi | 42 | 33rd | B | 7 | 1175 |

(Exh. P–154)

---

6. Of course, in the "real" world—as opposed to the world of damages—Kyriazi and Liu could not receive the same ranking; there can, for example, only be one 20th best employee. But discrimination has distorted the merit system, making it impossible for us, years later, to determine what is based on merit, and what is not. We cannot fix exactly where she should have been. We only know that she should not have been any lower than Liu. The Court has previously held, in connection with the class case, that where more than one class member claims entitlement to the same promotion all must be deemed to be entitled to it for remedial purposes, unless Western can prove which one would have received it. The same reasoning applies here.

For the period following her termination, Kyriazi should not be shackled with Liu's descending career. Kyriazi's ratings and ranking from 1971 on will be fixed at what we have determined they should have been upon her termination in computing back pay. She will continue with that rating thereafter. Western has offered us nothing to indicate that her performance would have dropped off after 1971.

It is also clear that an employee with Kyriazi's experience and proper rating would, if she maintained them, have been promoted. Liu, as we have noted, would have been promoted if he had maintained his job performance. Kyriazi entered the Information Systems organization as a Staff member in 1969. After considering the employment histories of her male co-workers, it is impossible to assess the exact time when she should have been promoted. It is clear, however, that while average waiting periods for promotion varied it should not have taken longer than 3 years at the very most for a "B" rated Information Systems organization Staff member to be promoted to "Senior" during the relevant period of our inquiry. Kyriazi first entered Information Systems organization as a Staff member. As of February, 1969, she held the rank that Liu did not achieve until May of that year. Indeed, since her transfer was lateral, from Industrial Engineer in another department to Staff member, she had effectively held the same rank since May 1, 1967. Thus, at the time of her discharge in November of 1971 she had been a Staff member for two and one-half years in Information Systems organization, and held an equivalent rank elsewhere in Western for approximately two and one-half years before that, for a total of five years. Recognizing that it may not be realistic to credit all of her prior service rendered at an equivalent rank in another department, it is nonetheless apparent that she should have been promoted to Senior member within two years after her transfer into Information Systems organization.

We find that plaintiff should have been designated as a Senior not later than March 1, 1971.

Accordingly, she will be reinstated at the level of Senior. She will, of course, receive all retroactive benefits, including seniority and pension benefits. To the extent that any such benefits are computed on the basis of salary or rating, they must be based upon the salary and rating as found by the Court. Counsel will compute Kyriazi's salary as if she had been promoted to Senior as of March 1, 1971; and that thereafter, for the period from November, 1971, until reinstatement her salary will be computed at the average ranking and rating ordered for her during the earlier period. From this, counsel will deduct the salary Kyriazi actually received as well as the following further deductions. First, the sum of $1,175 must be deducted from Kyriazi's back pay award to reflect the severance pay Kyriazi received from Western. Second, her unemployment insurance payments in the amount of $5,681 must also be deducted. Finally, counsel will add interest at the rate of 8%.[7]

The question of the deductibility of unemployment benefits from Title VII back pay awards merits some discussion. Plaintiff relies on the Supreme Court's decision in *National Labor Relations Board v. Gullett Gin Co.,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), which involved a back pay award in the analogous area of unfair labor practices. There, the Court approved the N.L.R.B.'s refusal to deduct unemployment benefits from the back pay award:

> Such action may reasonably be considered to effectuate the policies of the Act. To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole . . . Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from

7. The 8% interest, of course, will not be awarded on the entire back pay award, but will be keyed to each year's differential. Thus, for example, interest on the 1975 differential will accrue as of 1975, and so forth.

taxation. . . . We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering back pay does not make the employees more than "whole" as that phrase has been understood and applied.

*Id.,* at 364–5, 71 S.Ct., at 340 (footnote omitted). However, as defendant points out, the circuit courts have not extended this rationale to Title VII. Thus, in *Equal Employment Opportunity Commission v. Enterprise Association Steamfitters Local No. 638,* 542 F.2d 579 (2nd Cir. 1976), the Second Circuit upheld the district court's deduction of unemployment benefits from a back pay award:

> We see no compelling reason for providing the injured party with double recovery for his lost employment; no compelling reason of deterrence or retribution against the responsible party in this case; and we are not in the business of redistributing the wealth beyond the goal of making the victim of discrimination whole.

542 F.2d at 592. *See also Satty v. Nashville Gas Co.,* 522 F.2d 850 (6th Cir. 1975), *vacated and remanded on other grounds,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); *Bowe v. Colgate Palmolive Co.,* 416 F.2d 711, 721 (7th Cir. 1969); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 401 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1041, 97

S.Ct. 741, 50 L.Ed.2d 753 (1977) (affirming *without discussion* the district court's calculation of back pay award which had deducted unemployment insurance). In light of this authority, the Court is bound to reduce Kyriazi's back pay award by the amount of the unemployment benefits she received following her termination by Western.[8]

All that now remains is the question of damages against the individuals under state law.[9] Insofar as Kyriazi has already been fully compensated under Title VII, only punitive damages will be assessed against these individuals.[10] Under New Jersey tort law:

> Punitive or exemplary damages . . . are [appropriate] when the wrong-doer's conduct is especially egregious. They are awarded upon a theory of punishment to the offender for aggravated misconduct and to deter such conduct in the future.

*Leimgruber v. Claridge Associates, Ltd.,* 73 N.J. 450, 375 A.2d 652 (1977).

While it is hardly this Court's role to penalize mere rudeness, when a party's deliberate conduct is so extreme that it intentionally interferes with another's ability to practice a profession or earn a livelihood, the wrongdoer must be punished and deterred. It is clear from the conduct of the individual defendants, Snyder, Armstrong and Liu, that they made Kyriazi's work environment intolerable. They shot rubber bands at her. They engaged in boisterous

---

**8.** The Court rejects defendant's proposed finding # 11, in which it argues that Kyriazi's back pay award should be further reduced because she failed to mitigate damages between January 1, 1979 and April 30, 1979. We find no credible evidence of such a failure.

**9.** The individual defendants—Wilser, Boyd, Armstrong, Snyder and Liu—were held liable under state law for having maliciously interferred with Kyriazi's employment with Western. *See, Kyriazi v. Western Electric,* 461 F.Supp. at 949–50. This Court's subject matter jurisdiction over the state law claims against them is addressed at note 3, *supra.*

**10.** New Jersey law recognizes the "collateral source rule" whereby a tort victim may recover more than once for the same injury provided each recovery comes from a different source.

*See Hedgebeth v. Medford,* 74 N.J. 360, 378 A.2d 226 (1977).

However, under Title VII law, collateral recoveries are not permitted. *See* discussion *supra* in connection with the deductibility of unemployment benefits. Therefore, Kyriazi may not recover under state law the same damages she recovers under Title VII. She will receive no recovery from the individual defendants for "damage to her reputation" and "damage to her professional advancement" because she is adequately compensated for such injuries by back pay and reinstatement. In any event, if she seeks damages other than back pay on her claims for "damage to reputation" and "damage to her professional advancement", she has offered no evidence of such additional damage. Therefore, it is apparent to the Court that her claims for damages under state law are identical with her claim for back pay under Title VII.

speculations about her virginity. They circulated an obscene cartoon depiction of her. Kyriazi's supervisors, Wilser and Boyd, aware of this conduct, chose simply to ignore it, thereby acquiescing in it. Indeed, when forced to confront her complaints, they swept them aside. Her reaction to this conduct provoked, in large part, her ultimate termination from Western.

The Court, in the exercise of its discretion, will assess punitive damages against each of the individual defendants in the amount of $1,500. This sum is hardly onerous. It represents the least amount that the Court finds adequate to punish these individuals for their egregious treatment of Kyriazi.[11]

Western has taken the position that it may indemnify these employees. It is not prepared to indicate even yet whether it will or will not. The Court will order that Western may not indemnify these individuals.[12] Any other result would permit Western to entirely circumvent the purpose of the punitive damages which have been awarded, and to pass on to its shareholders or to the consuming public the consequences of the wrongdoings of its employees—which the Court has determined should be borne by them personally.

Accordingly, counsel are directed to formulate the precise amount of back pay due Kyriazi and to submit a final order, in accordance with this opinion, which will dispose of Kyriazi's individual case.

11. The Court, based on its study of the salary structure at Western, is in an excellent position to make this assessment.

12. There appears to be no case law on whether an employer can be prohibited from indemnifying an employee for *punitive* damages. An analogous line of cases holds that, for public policy reasons, an insurer may not indemnify an insured for punitive damages. *See* W. Prosser, Torts 12–13 (4th Ed. 1971).