Robert Anthony REED, et al., Plaintiffs,

v.

James A. RHODES, et al., Defendants.

No. C73-1300.

United States District Court,
N. D. Ohio, E. D.

June 10, 1981.

Michael Sussman, U. S. Dept. of Justice, Civil Rights Div., Washington, D. C., amicus curiae.

James L. Hardiman, Cleveland, Ohio, Thomas I. Atkins, Theresa Demchak, NAACP, New York City, for plaintiffs.

Mark O'Neill, Cleveland, Ohio, for State.

George I. Meisel, James P. Murphy, William Baughman, Jr., Cleveland, Ohio, for local defendants.

MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

On August 31, 1976, this Court found the local defendants (the Cleveland Board of Education, its members, and its appointed Superintendent) and the state defendants (the State Board of Education, its members, and its appointed Superintendent) liable for violating the plaintiffs' Fourteenth Amendment rights by intentionally fostering and maintaining a segregated school system within the Cleveland School District. *Reed v. Rhodes*, 422 F.Supp. 708 (N.D.Ohio 1976), *remanded*, 559 F.2d 1220 (6th Cir., July 20, 1977), *remand opinion issued*, 455 F.Supp. 546 (N.D.Ohio 1978), *remedial order entered*, 455 F.Supp. 569 (N.D.Ohio 1978), *aff'd in part, remanded in part*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). At that time, the Court announced its intention to appoint a special master to assist in formulating and implementing a remedy. 422 F.Supp., at 797. Daniel R. McCarthy was appointed as Special Master on September 14, 1976, and served admirably in that capacity until his discharge on February 25, 1981.

Presently pending before the Court are the applications for fees of the Special Master covering the period from March 1, 1978 to August 30, 1980. A hearing on this matter was held March 16–18, 1981. Briefs have been filed by all parties, by the Special Master, and by the United States, appearing as *amicus.*

Addressing an earlier application for fees of the Special Master, covering the period from September 14, 1976, to February 28, 1978, the Court, in a Memorandum Opinion and Order of August 25, 1978, awarded the Master and his associates a fee of $445,216.25, at an average hourly rate of $110.00 per hour. The Court of Appeals found this

award to be excessive, and concluded that the Special Master was entitled to $65.00 per hour and his associates to $40.00 per hour. *Reed v. Cleveland Bd. of Ed.*, 607 F.2d 737 (6th Cir. 1979).

The Special Master, in his several applications for fees, in his Brief in Support of Special Master's Interim Fee Application [Special Master's Trial Brief], and in his Post-Hearing Brief in Support of Special Master's Interim Fee Application [Special Master's Post-Hearing Brief], argues that the Sixth Circuit decision is not applicable to the presently pending fee applications because of the differences between these and the earlier applications in, among other factors, type of work performed, quantity of work involved, and overall conditions. Amended Second Application for Interim Fees by the Special Master, p. 3. Accordingly, the Special Master seeks compensation in the following amounts:

*Amended Second Application* (March 1, 1978–December 31, 1979)

Fees: $339,681.15 (With hourly rates ranging from $125.00 per hour for Daniel R. McCarthy to $75.00 per hour for his associates.)

Expenses: $8,090.00.

*Third Application* (January 1, 1980–February 29, 1980)

Fees: $49,774.75 (With hourly rates ranging from $150.00 per hour for Daniel R. McCarthy to $90.00 per hour for an associate.)

Expenses: $976.00

*Fourth Application* (March 1, 1980–June 30, 1980)

Fees: $92,406.25 (With hourly rates ranging from $150.00 per hour for Daniel R. McCarthy to $50.00 per hour for an associate.)

Expenses: $2,772.19

*Fifth Application* (July 1, 1980–August 30, 1980)

Fees: $66,532.06 (With hourly rates ranging from $150.00 per hour for Daniel R. McCarthy to $90.00 per hour for an associate.)

Expenses: $1,250.00

Total:

| | |
|---|---|
| Fees: | $548,394.21 |
| Expenses: | $13,088.19 |
| Grand Total: | $561,482.40 |

In his Trial Brief and his Post-Hearing Brief, the Special Master argues that he is entitled to the full compensation requested, as his services were performed in furtherance of fundamental civil rights.

In their various responses to the Master's several applications for fees, the local and state defendants object to the Master's request that he be compensated at a rate higher than that established by the Sixth Circuit, although both acknowledge that the rates might be appropriately adjusted upward for inflation. They also contend that he is entitled to no compensation for time spent in collection of fees previously authorized by the Court. In their post-hearing briefs they further argue that no compensation should be paid for time spent by an associate of the Special Master "in assisting the Court in its preparation of its findings and conclusions on the issue of the Cleveland Board's contempt." Memorandum of State Board of Education and Superintendent of Public Instruction Concerning Special Master's Applications for Fees [State defendants' Memorandum], p. 3. *See also*, Post-Hearing Brief of Defendant Cleveland Board of Education Re Special Master's Interim Fee Application [local defendants' Brief], pp. 11–12. The Court addresses these arguments in sections III.A. and V. of this opinion below.

The Plaintiffs, in their Plaintiffs' Brief on Special Master's Interim Application for Fees [plaintiffs' Brief], take the position that the Sixth Circuit decision establishes a base rate for the Master and his associates which should be adjusted upward on the basis of various factors.

The United States, in its initial Response of the United States to the Special Master's Several Applications for Fees, took the position that this Court should be guided by the formula established by the Sixth Circuit. However, in the Post-Brief of the United States, *Amicus Curiae*, on the Special Master's Several Applications for Fees [United

States Brief], the United States argues that the Sixth Circuit decision does not establish an immutable standard governing the presently pending fee applications. United States Brief, p. 10.

The Court is of the opinion that the whole issue of the appropriate compensation for the Special Master requires careful re-examination. The Court is aware that its decision may be construed as a dissent to the Sixth Circuit's opinion. It is not so intended. The Court is confident that it has been every bit as deliberate as the Court of Appeals in reaching its decision. With full appreciation of the need for orderliness in the system, and fully cognizant of the fact that it is bound by the law of the circuit, the Court has made every effort to apply the substance of relevant principles of law, equity, and, above all, reason.

## I. The Service of the Special Master

From the date of his appointment until he was discharged on February 25, 1981, the Special Master provided quality service of inestimable value to the school system and to the Court, in an atmosphere created primarily by the local defendants of hostility and recalcitrance.

When the Special Master started, he found a school system in managerial and financial shambles, ill-equipped and ill-prepared to plan for and implement an appropriate desegregation remedy. TR 90–97.[1] There was no transportation system in place. TR 90. The school system was in debt in excess of $50 million, before incurring any expenditures for desegregation. TR 95–96. The accounting system was completely inadequate. TR 96. And the school district lacked competent management. TR 96. There is no need to repeat here what is already a matter of record. See Reed v. Rhodes, 455 F.Supp. 564, 605–606 (N.D.Ohio 1978). The Court brings at-

tention to these facts now only to illustrate the magnitude of the task with which the Special Master was faced upon his appointment. The record clearly shows that the local defendants were not merely unable to implement desegregation, they were also, to a great extent, unwilling. Id. Their adversary relationship with the Special Master, see TR 97, 330, 338, and their recalcitrance in conforming to the letter and spirit of this Court's orders, was to continue throughout the period relevant here (March 1, 1978–August 30, 1980) and, indeed, persists today. It was this persistent attitude on the part of the local defendants which led the Court, on July 25, 1980, to order the local defendants to employ an Administrator of Desegregation. Reed v. Rhodes, 500 F.Supp. 363, 402 (N.D.Ohio 1980), aff'd in relevant part, 635 F.2d 556 (6th Cir. 1980).

Clearly, the task of a Special Master working in such a hostile atmosphere is considerably more difficult than it would be if the defendants accepted liability and cooperated in formulation and implementation of an appropriate remedy. The Court knows of no other city in the country, subject to a desegregation order, where the defendants have been so completely unhelpful. If, as a result, the Master spent more time than would otherwise have been necessary, the defendants have only themselves to blame. See Chesa International, Ltd. v. Fashion Associates, Inc., 425 F.Supp. 234, 238 (S.D.N.Y.1977), aff'd, 573 F.2d 1288 (2d Cir. 1978).

During the period relevant here, the Master's primary task was implementation of the Remedial Order entered on February 6, 1978 and supplemental orders.[2]

Accordingly, the Master, with the assistance of members of his firm, assisted in the search for and appointment of a Deputy Superintendent for Desegregation, Special Master's Trial Brief, at 5,[3] SMX 4(a), assist-

---

1. TR = Transcript of March 16–18 hearing. Exhibits are cited as follows: SMX = Special Master's Exhibit; SDX = State defendants' Exhibit; LDX = local defendants' Exhibit.

2. The distinction between this period and the earlier period, when the Master's primary task

was formulation of the remedy, is significant. See below, pp. 569–570.

3. The Special Master testified to the accuracy of the factual portion of his Trial Brief which was, in the interest of time, received into evi-

ed the Deputy Superintendent in establishing a Department of Desegregation Implementation [DDI], Trial Brief at 5, SMX 4(b), assisted him in planning for desegregation implementation, id., and participated in hearings concerning the Deputy Superintendent and staffing of DDI, Trial Brief, at 6. The Master also worked with Ernst and Ernst (now Ernst and Whinney) on the local defendants' planning for school closings, id., SMX 4(c), monitored the state defendants' attempts to contract for a transportation system, Trial Brief, at 7, and assisted the Court in dealing with the defendants' request that they not be required to provide such a transportation system.

The Master reviewed and reported to the Court on the work of the Deputy Superintendent for Desegregation. The Master reviewed recommendations of the Deputy Superintendent for Desegregation, and reported to the Court. Id., at 8, SMX 4(d).

The Master also assisted the Court in establishing the Office on School Monitoring and Community Relations (OSMCR). Trial Brief, at 7, TR 180. He conferred with OSMCR on progress toward implementation of the remedy. Trial Brief, at 7–8. He also assisted OSMCR in recruiting and choosing people to serve on OSMCR's Advisory Commission. Id., at 8.

The Master worked with the Safety and Security Division of DDI and with law enforcement agencies to ensure that the desegregation remedy would be implemented safely. Id.

The Master attended hearings on the local defendants' proposed modification of the plan for desegregation implementation, and assisted the Court in reviewing the evidence and deciding upon an appropriate course of action. Id. at 8–9.

During the last few months of 1978, the Master monitored the progress of the defendants in preparation for the first phase of desegregation, then scheduled to commence in February, 1979. Id. at 9. In November the defendants, pursuant to Court order, submitted a new proposed implementation plan, on which the Master conducted hearings and made recommendations to the Court. Id., at 10, SMX 4(g). The Master attended the hearings held in November and December of 1978 on acquisition of vehicles, and funding for transportation. Trial Brief, at 10. He also reviewed and commented on a proposed special transfer policy, id., and a school closing report. Id., at 11.

Early in 1979, the Sixth Circuit stayed implementation of the Remedial Order. Nonetheless, implementation planning continued. Between January and June, 1979, the Master reviewed and reported to the Court on a student disciplinary code, definition of magnet schools and programs, a student reassignment plan, other implementation planning activities, and applications for federal grants to aid in desegregation implementation. Id.

In July, 1979, the Master submitted a report and recommendations to the Court proposing that desegregation proceed in three phases, to begin in September, 1979. SMX 4(j), Id., at 11–12. He was also instrumental in obtaining ESAA funding for the District. Id., at 12, TR 188–189, 226–228, 311–312.

In September, 1979, concerned with the poor progress being made towards implementation by the local defendants, the Master, with OSMCR, developed a system of comprehensive status reports to be submitted periodically by the defendants. Trial Brief, at 12, SMX 4(k).

The Master coordinated law enforcement agencies and the Safety and Security Division of DDI in planning for safe implementation, attended hearings on safety and security, and kept the Court apprised of planning for safe implementation. Trial Brief, at 13.

At the beginning of the 1979–80 school year, the Master reviewed the special transfer policy proposed by the Cleveland de-

dence. TR 167–168. The Court relies on it only to the extent that it contains uncontrovert-

ed statements of fact or matters already of record.

fendants and reported his findings to the Court. *Id.*, SMX 4(*l*). He also recommended an interim procedure for dealing with special transfer requests until an acceptable policy was submitted. Trial Brief, at 14. In September, this Court reluctantly imposed on the Special Master the burdensome task of giving final approval or disapproval to all special transfer applications. This administrative burden continued until the Court gave final approval to a student assignment policy, submitted by the Administrator, on February 6, 1981. Something in the region of 2,000 special transfer requests were processed in this fashion. TR 285.

At the end of August, 1979, the Master reported to the Court on the defendants' preparedness for desegregation implementation, on which a hearing was held in September. Trial Brief, at 14, SMX 4(m). The Master closely monitored subsequent implementation. Trial Brief, at 14.

In the last months of 1979, the Master prepared and filed a report on OSMCR's finances, SMX 4(n), reviewed the local defendants' magnet school proposals, reviewed and reported to the Court on the defendants' school placement policy, SMX 4(*o*), prepared and filed a report on the organizational and tax structure of OSMCR, SMX 4(p), and reviewed and discussed with the Court another motion of the local defendants to modify the Remedial Order. Trial Brief, at 15. The Master also attended various hearings during this period. *Id.*

In January, 1980, the Master, based on OSMCR's reports on Phase I implementation and the local defendants' motion requesting delay of Phase II implementation, prepared and filed with the Court an extensive report on implementation to date and made recommendations to the Court. *Id.*, SMX 4(q). The Master prepared for hearings, to be held in February and March, on the Master's report and on the defendants' preparedness for Phase II implementation. Trial Brief, at 15–16.

In March, 1980, the plaintiffs filed a motion to show cause why the local defendants should not be held in civil contempt. At the defendants' request, the Court combined the hearings on the plaintiffs' motion and the Master's January report. These hearings started in April and continued through June, 1980. The Master, who was well acquainted with the underlying facts, participated in these hearings. *Id.*, at 16.

During this period, the Master also reviewed the District's appropriations budget to determine the impact of the District's financial condition on desegregation implementation, reviewed and made recommendations to the Court on a school closing report submitted by the defendants, reviewed a magnet school proposal, and after the contempt hearings were over, made recommendations to the Court. *Id.*, at 16–17, TR 285.

In July, 1980, the Master, at the Court's direction, reviewed and reported to the Court on the local defendants' plans to reinforce DDI. SMX 4(r), Trial Brief, p. 17. On July 25, 1980, the Court issued its opinion and order finding the local defendants in civil contempt and ordering appointment of an Administrator of Desegregation. *Reed v. Rhodes*, 500 F.Supp. 363 (N.D.Ohio), *aff'd in part, vacated in part*, 635 F.2d 556 (6th Cir. 1980), *further* modified 642 F.2d 186 (6th Cir. 1981).

In August, 1980, the Master filed a report regarding extra-curricular activities. Trial Brief, pp. 17–18, SMX 4(s). The Master also assisted the Court in interviewing candidates for the position of Desegregation Administrator, SMX 4(t), and upon the appointment of Dr. Donald Waldrip to that position, familiarized him with the Remedial Order and the degree of implementation. Trial Brief, at 18. After the appointment of the Administrator, the Special Master filed reports with the Court on OSMCR's financial report and budget, SMX 4(v), a student assignment plan, SMX 4(w), indemnification of OSMCR personnel, SMX 4(x), magnet and vocational schools and programs, SMX 4(y), a special transfer policy, SMX 4(aa), the Administrator's attempts to secure a transportation director, SMX 4(bb), extracurricular activities, SMX 4(cc), status report requirements, SMX 4(dd), school

closings, SMX 4(ee), and, finally, the Special Master filed an extensive and comprehensive report on the finances and administration of the Cleveland School District, SMX 4(ff).

Throughout the period relevant here, the Master reviewed and where necessary acted upon weekly status reports, OSMCR reports, bi-monthly land sales reports, special transfer applications, and filings by the parties. He also assisted the District in obtaining federal desegregation funds, met with private foundations and others to encourage their participation in desegregation, met with counsel, local and state Board members, outside experts and state legislators as the need arose, and conferred with OSMCR, the Court, and the Administrator. Trial Brief, at 19–20. TR 265–267, 271–274, 276–278. *See also*, Affidavit of Ms. Tommie C. Jones.

The Master brought to bear on these varied tasks considerable legal, financial, and management expertise. His work was of significant benefit to the school system, TR 386, especially in the areas of management and finance, areas in which the defendants lacked competence. TR 409–410, 521–535 (Testimony of local Board member, Kenneth Seminatore; Business Manager, George Mazzaro; and Treasurer, Paul Yacobian.) His reports, which were always of the highest quality, were also of enormous benefit to the Court.

## II. Setting a Fee: The Applicable Standard

There is a singular lack of case law respecting appropriate compensation for special masters in public litigation. The seminal case setting forth applicable standards is *Newton v. Consolidated Gas Co.*, 259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844 (1922), wherein it is said:

The value of a capable master's services can not be determined with mathematical accuracy; and estimates will vary, of course, according to the standard adopted. He occupies a position of honor, responsibility and trust; the court looks to him to execute its decrees thoroughly, accurately, impartially and in full response to the confidence extended; he should be adequately remunerated for actual work done, time employed and the responsibility assumed. His compensation should be liberal, but not exorbitant. The rights of those who ultimately pay must be carefully protected; and while salaries prescribed for judicial officers performing similar duties are valuable guides, a higher rate of compensation is generally necessary in order to secure ability and experience in an exacting and temporary employment which often seriously interferes with other undertakings. 259 U.S. at 105, 42 S.Ct. at 439. (Citations omitted.)

■ This Court followed *Newton* in its earlier fee award to the Master. Memorandum Opinion and Order, August 25, 1978, at 14–15. The Sixth Circuit, however, following a passing remark of Judge Jack B. Weinstein in *Hart v. Community School Board of Brooklyn*, 383 F.Supp. 699 (E.D.N.Y.1974), aff'd, 512 F.2d 37 (2nd Cir. 1975), found the award to be excessive.[4] *Reed v. Cleveland Board of Education, et al.*, 607 F.2d 737, 746 (6th Cir. 1979). The Court of Appeals concluded that fair compensation for the Master could be determined by the *Hart* formula, and found that the Master should be compensated at a rate of $65. per hour "which is one-half the highest Cleveland rate found by the district court, and approximately two-thirds the average rate of experienced Cleveland trial attorneys." *Id.* The Court nonetheless opined that "many of the considerations which apply to the setting of attorneys' fees in public litigation apply to setting the fees of a special master." *Id.* With the latter statement this Court is entirely in agreement.

As the Court remarked in *Kyriazi v. Western Elec. Co.*, 465 F.Supp. 1141, 1148 (D.New Jersey 1979),

---

4. Judge Weinstein said: "Preliminary discussions with counsel suggest that a reasonable fee would be based upon about half that obtainable by private attorneys in commercial matters." 383 F.Supp. at 767.

[s]ince the *Newton* decision, the compensation of special masters has received little discussion: some courts have approved the award of fees which appear to be roughly comparable to that which is earned in private practice; *see, e. g., American Safety Table v. Schreiber*, 415 F.Supp. 373 (2nd Cir. 1969) (approving rate of $40 per hour—in 1969); *Chesa International v. Fashion Associates*, 425 F.Supp. 234 (S.D.N.Y.1977) (fee of $100 per hour), while others have approved a somewhat lower rate, *see, e. g., Hart* [supra] (fee of law school professor in school desegregation case to be about half that charged by attorneys in private practice, but overhead costs paid.).[5]

The *Kyriazi* court concluded that Special Masters should be compensated "in a manner roughly comparable to that which they receive in the practices from which they are being diverted." 465 F.Supp. at 1148. The Court thus established a rate of $125 per hour for one Master, and $115 per hour for each of two others.

*Kyriazi*, is, of course, distinguishable from the present case. The fees were set in advance of the Special Masters' assumption of their duties, something which this Court, regrettably, neglected to do. Furthermore, although *Kyriazi*, like *Reed v. Rhodes*, was a civil rights class action, the defendant, Western Electric, was a private entity. The fees would therefore not be paid from public coffers. However, as the Third Circuit noted in *Rodriguez v. Taylor*, 569 F.2d 1231, 1249, n. 32 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978): "The fact that the City of Philadelphia must pay the fees award does not warrant special standards for public and private employees. The reasonable value of an attorney's time does not depend on who his or her adversary is."

*Kyriazi*, while significant, does not articulate standards for determining an appropriate fee for public litigation Masters. The *Hart* standard, adopted by the Sixth Circuit, is, in this Court's opinion, inapposite to the presently pending fee applications. The Master in *Hart*, as in most desegregation cases, was engaged to assist the Court in *formulation* of a remedy; he was, that is to say, a "pre-decretal" master.[6] See 383 F.Supp. at 767. Formulation of a remedy was the primary task facing the Master, parties, and Court in *Reed v. Rhodes* during the period covered by the earlier fee application. The primary task facing the Master, parties, and Court during the period covered by the presently pending fee applications, however, was *implementation* of the Remedial Order entered on February 6, 1978. Mr. McCarthy became, in other words, a "post-decretal" Master. Formulation of a remedy, although by no means easy, is a task of finite duration, manageable proportions, and is subject to control. Implementation, on the other hand, especially in the circumstances of this case, marked by hostility and recalcitrance on the part of the local defendants, is indefinite in duration, considerably more taxing on energy and resources, and far less susceptible to control by the Master of time and scheduling.

Further, Sixth Circuit decisions since the decision applying the *Hart* formula suggest that rates available to attorneys in public litigation, which, as the Court remarked in *Reed, supra*, 607 F.2d at 746, should guide

---

**5.** It should be noted that, as the Master's firm's fees are computed, approximately 50% of the fee covers overhead costs. TR. 82, 159–60. The logic of *Hart* would suggest that a Master be paid an hourly rate (equal to 50% of the prevailing rate) *plus* overhead (roughly equal to 50% of the prevailing rate), i. e., the Master's hourly rate (*including* overhead) would equal 100% of the prevailing rate. The Sixth Circuit, however, did not find this logic persuasive, and, in denying the Master's petition for rehearing, said that overhead had been taken into account. Order, Oct. 2, 1979.

**6.** This is the language of Professor Vincent M. Nathan of the University of Toledo College of Law. *See*, "The Use of Masters in Institutional Reform Litigation," 10 Toledo L.Rev. 419–464 (Winter 1979). Professor Nathan distinguishes between "pre-decretal" masters, charged with formulating a remedy, and "post-decretal" masters, charged with monitoring and implementing the remedy.

courts in awarding fees to Masters in such cases, should be comparable to "the fair market value of the services provided." *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 638 (6th Cir. 1979).

*Northcross*, admittedly, was decided under the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, which has no direct application to compensation of Masters. Nonetheless, the Act and decisions construing it establish standards for award of attorneys' fees in public litigation. If courts are to be able to secure the services of competent and experienced lawyers or other professionals to serve as Masters, they must be able to guarantee them compensation no less than that available to such attorneys. And attorneys in public litigation should be compensated as well as their counterparts in the private bar, if "private attorneys general" are to be encouraged to prosecute civil rights violations.[7]

By far the most cogent and articulate decision setting forth an objective and rational set of criteria for determining a reasonable attorney's fee in civil rights actions is *Copeland v. Marshall*, 641 F.2d 880 (D.C. Cir.1980) (*en banc*), construing 42 U.S.C. § 2000e–5(k). Underlying the *Copeland* criteria is the principle that "[a]n award of fees provides an incentive to competent lawyers to undertake Title VII work only if the award adequately compensates attorneys for the amount of work performed." *Id.*, at 890. Similar incentives must surely be offered to Masters, if courts are to be able to secure the services of qualified professionals.

The *Copeland* court, following the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (1973) (*Lindy I*), and its successor case, *Lindy II*, 540 F.2d 102 (1976) (*en banc*), proposes that, as a starting point for fee setting, the court calculate a "lodestar" fee: the number of hours reasonably expended multiplied by a reasonable hourly rate. This "lodestar" figure may then be adjusted, up or down, to reflect various factors, e. g., quality of service, or delay in receipt of fee. As the Sixth Circuit has said, *Oliver v. Kalamazoo Board of Education*, 576 F.2d 714, 715–716 (6th Cir. 1978), "[a]ttorneys' fee awards should be high enough to attract competent counsel yet not so high as to provide a windfall for them. Multiplying the number of hours properly spent times a reasonable hourly rate is sufficient to serve this goal."

This Court concludes, in agreement with the *Copeland* court, that such a calculation provides "the only reasonably objective" starting point for awarding a fee. *Id.*, at 891 (citing *Lindy I*). The Court also concludes that calculation of the fee in this manner is appropriate to establish fair and reasonable compensation for the Special Master.

## III. Calculation of the "Lodestar"

### A. The Number of Hours Reasonably Expended

No party raises serious questions about the hours claimed by the Master in his several fee applications. The State defendants suggest that there may be inaccuracies, State defendants' Memorandum, p. 2, but offered no supporting evidence. In-

---

**7.** It was this consideration which prompted Congress to pass the Civil Rights Attorney's Fee Award Act of 1976. *See* S.Rep.No.1011, 94th Cong., 2d Sess. 2, *reprinted in* [1976] U.S. Code Cong. and Ad.News 5908, 5909–5910: "The purpose and effect of [the Act] are simple—it is designed to allow courts to provide the familiar remedy of reasonable counsel fees to prevailing parties in suits to enforce the civil rights acts which Congress has passed since 1866. [The Act] follows the language of Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k), and sec-

tion 402 of the Voting Rights Act Amendments of 1974, 42 U.S.C. 19731(e). All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." No lesser considerations should apply to compensation of Masters in public litigation who make significant personal sacrifice in the public interest. They should not also be required to make unreasonable financial sacrifice.

deed, under cross-examination by Mr. O'Neill, representing the State defendants, Mr. McCarthy testified that, despite the fact that he worked in excess of eight hours on many days, he only billed for eight hours per day. TR 233–234. To the Court's knowledge, the Master worked more than eight hours per day frequently. The Master was also in the habit of rounding down to the nearest quarter fractions of hours spent. TR 235. The Master also, to the Court's knowledge, worked frequently on Saturdays, but did not claim these hours. The Master would therefore be entitled to claim many more hours than he has claimed.

Further, as noted above, SMX 5(ff) much of the Master's work was occasioned by the local and State defendants' inability or unwillingness to take responsibility themselves. They cannot now be heard to complain that he worked too long.

Both the State and local defendants argue that the Master should not be compensated for time spent litigating his earlier fee award, or for time spent by an associate reviewing transcripts and preparing proposed findings and conclusions for the Court. Compensation for time spent and costs incurred litigating the earlier fee award is dealt with separately in section V., below.

█ The suggestion that the Master should not propose findings and conclusions to the Court is bizarre. This is the function of Masters *par excellence*. Furthermore, no party ever before raised any question as to the propriety of the tasks in which the Master was engaged, TR 326–327, despite the fact that the Master's fee applications, the first of which, relevant here, was filed in November of 1979, contained detailed time sheets. The Master was given a broad mandate, and the Court concludes that he never exceeded it. In any event, as the Master testified, he did not prepare "proposed findings and conclusions," rather he made recommendations to the Court. TR 285.

The Court therefore concludes that the number of hours reasonably expended is equal to the number of hours claimed.[8]

### B. A Reasonable Hourly Rate

█ The *Copeland* Court said that the reasonable hourly rate "is that prevailing in the community for similar work." 641 F.2d at 892. (Footnote omitted.) When setting a fee for public litigation attorneys, such a standard is easily applied. A Special Master, however, even if an attorney, performs many services which are not simply legal in nature. For example, he may do work more typically done by management consultants, financial advisors, or accountants. In general, the reasonable hourly rate for Special Masters, this Court concludes, is the prevailing rate available to similarly experienced professionals performing like work.[9] Thus, the factors relevant to setting a reasonable hourly rate include the customary fee for similar work; the experience, reputation, and ability of the person serving as Master; the necessary level of skill to perform the Master's duties properly. As the *Copeland* Court noted, "there may be more than one reasonable hourly rate for each of the attorneys, and for each of the kinds of work, involved in the litigation." *Id.*

The Master and his associates spent their time on a variety of tasks requiring different levels of skill and calling for different areas of expertise. *See* the time summaries

8. Hours spent litigating the earlier fee award are treated separately in section V.

9. Professionals providing many of the services provided by the Special Master command a higher hourly rate than the Master requests for those services on behalf of himself or his associates. For example, the Master provided services typically provided by management consultants, TR 328, 409, who would ordinarily command a higher rate. TR 416–417. Furthermore, an attorney with a background in accounting would ordinarily command a higher rate than is requested for Mr. Furber, one of Mr. McCarthy's associates with such a background. TR 153–155. The Court has concluded, however, that the Master and his associates should not be compensated at a rate higher than they request, even though they could obtain higher rates for their services in other circumstances.

attached to the various fee applications. These tasks may be divided into two broad categories: professional services (for example, conducting hearings, participating in hearings, preparing for hearings,[10] researching and writing reports, conferring with counsel, etc.); and administrative services (for example, disposing of special transfer requests, arranging meetings, sharing information with the media, etc.)

■ For professional services, i. e. those services requiring professional skill and experience, the Court concludes that the Master and his associates should be compensated at the rate requested. For administrative services, the Court concludes that the Master and his associates should be compensated at rates equal to eighty percent (80%) of the rates requested, as these services did not require the high level of skill and experience necessary to the other tasks, but were nonetheless performed by. competent professionals.

Accordingly, for the period from March 1, 1978, to December 31, 1979, the Master and members of his firm shall be compensated at the rates set forth in Table 1, attached.

For the period from January 1, 1980, to August 30, 1980, the Master and members of his firm shall be compensated at the rates set forth in Table 2, attached.

Based on review of the evidence presented, the Court concludes that these rates are well within the range of rates available to similarly experienced professionals performing like work.

■ Lawyers familiar with the prevailing rates in the community and familiar with Mr. McCarthy's work and experience testified that a commercial trial lawyer of comparable experience can command a rate of at least $150.00 per hour, TR 101, 131–134, that a tort trial lawyer earns $200–250 per hour (based on dividing contingency fees earned by hours worked), TR 103, 112–

113, and that senior associates receive from $90.00 to $125.00 per hour. TR 132. The rates requested by the Special Master on behalf of himself and his associates are thus fairly comparable to the prevailing rates available to similarly experienced professionals providing a professional service. As has been noted, the professional services provided by the Master and his associates called forth all their legal, financial, and management expertise. *Supra,* p. 567.

Exhibits proffered by the State defendants show that counsel providing legal services to the Cleveland Board of Education regarding primarily labor, contract, and other more or less routine matters charge the Board top rates ranging from $60.00 per hour to $110.00 per hour, the average top rate being approximately $84.00 per hour. *See,* SDX 1–14. The Special Master offered evidence and exhibits which are more probative in that they show rates charged by counsel providing services to the Board in connection with *Reed v. Rhodes.* The top rates charged to the Board in this matter apparently range from $150.00 to $160.00 per hour. *See,* SMX 14, 16, Deposition of Paul Yacobian, p. 11. Squire, Sanders, and Dempsey, the principal counsel for the local defendants in *Reed v. Rhodes,* does not disclose an hourly rate in its billing statements to the Board, *see,* SMX 9, but, by affidavit of James P. Murphy, reports to the Court that the highest guideline hourly rate charged by Squire, Sanders and Dempsey has ranged from $130.00 in early 1978 to $155.00 in August, 1980. *See,* LDX A. The firm also, however, charges the Board for telephone and telegraph, internal printing and reproduction, stenographic/reporting, postage, messengers, and express, duplicating/telecopier, filing and registration fees, word processing, and other such services. *See,* SMX 9, TR 483. This is the kind of overhead expense which the Special Master's firm absorbs rather than charges for

---

**10.** The Court has not distinguished between time spent in Court and time spent out of Court for the purpose of computing an appropriate hourly rate. This is consistent with the practice of Squire, Sanders, and Dempsey, principal counsel for the local defendants, whose hourly

rates do not vary depending on the nature of the work performed. *See,* LDX A. It is worthy of note that the Cleveland Board of Education has never questioned a billing from Squire, Sanders, and Dempsey.

TR 177. The effective hourly rates for Squire, Sanders, and Dempsey are therefore significantly higher than would appear from the firm's fee schedule.

The Court therefore finds that the rates requested by the Special Master on behalf of himself and his associates are reasonable hourly rates.

### C. The "Lodestar"

The Court's calculation of the lodestar fee is set forth in Tables 3 and 4, attached.

The Court has carefully reviewed the time summaries attached to the Master's several applications for fees and has determined that approximately thirty percent of the Master's and his associates' time was spent on matters fairly characterizable as "administrative." Tables 3 and 4 reflect this assumption. The division is inevitably inexact, as the Master could not reasonably be expected to record his every activity.

Summing the totals from Tables 3 and 4, the Court concludes that the lodestar fee to which the Master and his firm are entitled is $460,977.66, which is equivalent to an average hourly rate of $106.33. This rate is certainly reasonable for services of the quality provided by the Master and his associates.

### IV. Adjustments to the "Lodestar"

In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), the Fifth Circuit set forth twelve factors relevant to setting an attorney's fees in public litigation. The *Copeland* Court acknowledged that these factors "remain central to any fee award." 641 F.2d at 889. (Footnote omitted.)

The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–719.

Clearly, these factors are neither exhaustive nor exclusive, and not all apply to setting fees for a Special Master in public litigation, whose position as an arm of the Court is different from the position of an attorney. Furthermore, as the *Copeland* Court recognized, "[s]imply to articulate those twelve factors ... does not itself conjure up a reasonable dollar figure in the mind of a district court judge." 641 F.2d at 890. It is for this reason that the first step in calculating a reasonable fee must be the determination of a reasonable hourly rate, based on the prevailing rate available to similarly experienced professionals performing like work. *See* p. 567, *supra*. The *Johnson* factors are relevant to adjustment of the "Lodestar" fee, calculated by multiplying the reasonable hourly rate by the number of hours reasonably expended. *See* 570, *supra*.

The Court concludes that, when setting a fee for public litigation Masters, the following factors are to be applied when adjusting the lodestar figure:[11] (1) the preclusion of other employment by the Master due to acceptance of the position; (2) time limitations imposed by the Court or the circumstances; (3) the results obtained; (4)

---

11. Time and labor required, the novelty and difficulty of the questions, the skill requisite to perform the legal service properly, the customary fee, and the experience, reputation, and ability of the attorneys (*Johnson* factors # (1), # (2), # (3), # (5), and # (9)) have already been considered, under this Court's analysis, in establishing the number of hours reasonably expended and a reasonable hourly rate (i. e. the prevailing rate available to similarly experienced professionals performing like work). Other *Johnson* factors (e. g., # (6), whether the fee is fixed or contingent) are not relevant.

the "undesirability" of the position; (5) awards in similar cases.[12]

There is little doubt that the Special Master's firm suffered as a result of his being diverted from his practice by his service as Master. TR 172–173. Also, the Master, to the Court's knowledge, was frequently required to work under severe time constraints. He nonetheless produced work of excellent quality, which was of enormous benefit to both the school system and the Court. *Supra*, p. 567.

Mr. McCarthy accepted the position against the advice of friends, TR 104–105, who advised that it could only hurt his practice and reputation. *Id.* His was a highly visible and controversial position, and his work was constantly subject to public scrutiny.

While these facts would justify an upward adjustment of the lodestar figure, the Court, mindful of the admonition in *Newton, supra,* pp. 567–568, that "[t]he rights of those who ultimately pay must be carefully protected," concludes that the lodestar figure represents reasonable compensation for the Master's services.

## V. Time Spent and Costs incurred in Preservation of Fees

█ The defendants argue that the Special Master should not be compensated for time spent or costs incurred litigating his earlier fee award. State defendants' Memorandum, pp. 2–3, local defendants' Brief, pp. 11–12.

The Special Master, in his Post-Hearing Brief, pp. 39–41, argues that "attorneys' fees incurred in the pursuit of fees stemming from civil rights actions . . . are fully recoverable." *Id.,* p. 39. However, as the local defendants note, the cases cited by the Master involved award of fees to parties successful in litigating a fee award. *See, Weisenberger v. Huecker,* 593 F.2d 49 (6th Cir. 1979), *Prandini v. National Tea Co.,* 585 F.2d 47 (3d Cir. 1978). The local defendants

argue that the Special Master was unsuccessful in defending the earlier fee award and so should receive no compensation for time spent on that unsuccessful defense. Local defendants' Brief, p. 12.

As the United States notes, in its response to the Special Master's Several Applications for Fees, "[w]hile a *party* who loses a lawsuit normally pays at least its own fees, this principle cannot be neatly applied to this matter." United States' Response, p. 2. The Special Master, although permitted to proceed as if a party for the limited and specific purpose of collection of his fees, is not a party to the principal action. He was rather appointed as an arm of the Court, to assist in formulation and implementation of a remedy. His position is clearly different from that of a private litigant who must bear the risks of litigation. *See,* United States' Response, p. 3. The Master here requested fees consistent with his usual billing practices, and this Court awarded him a fee accordingly. The hourly rate awarded was comparable with prevailing commercial rates. The Master therefore had every reason to believe that the award was defensible. To deny the Master adequate compensation for defending his fees award would jeopardize the Court's ability to retain qualified and competent professionals to serve as Masters. Furthermore, if the costs of the defense were to be borne by the Special Master, his reduced award would be further diluted.

The United States suggests that the Court exercise its equitable discretion and award the Master half the costs incurred in defending his fee award. *Id.* The Court appreciates the intent of the United States' suggestion but concludes that, in the egregious circumstances present here, the Master should be fully compensated for defending the earlier fee award. The local defendants had assured the Court, both publicly and privately, that they had no objection to the Special Master's hourly rate.[13]

---

12. There are, as yet, few similar cases.

13. See Transcript of Proceeding held April 28, 1978, at p. 209:

MR. MEISEL: [Counsel for the local defendants] Your honor, I do want to put on the

Furthermore, the State defendants, knowing that the Court had inadvertently failed to set the Master's fees at the outset, took the position that it was for the Court to set a fee which the State defendants would then appeal, and offered no help to the Court in setting a reasonable figure. In these circumstances, the Master should not be required to bear the costs of defending his fee award.

■ In his several applications for fees, the Master requests $33,308.75 in fees, and $16,975.57 [14] in costs and expenses for litigating the earlier fee award. The total fees and costs incurred in preservation and collection of fees is therefore $50,284.32. Therefore, the Master shall be compensated in this amount for time spent and costs incurred in preservation and collection of fees.

## VI. Conclusion

■ The Court has found that the Master and his associates are entitled to compensation in the following amounts:

(a) for professional and administrative services:   $460,977.66

(b) for preservation and collection of fees:   $ 50,284.32

The Master also properly claims, exclusive of costs incurred in preservation and collection of fees, out-of-pocket expenses in the amount of $11,638.01.

■ The local and State defendants are jointly and severally liable for compensation of the Special Master. The matter of state liability, however, is on appeal to the Sixth Circuit. The local defendants shall

therefore immediately pay to the Master $522,900.17 subject to reimbursement by the State of half this amount upon the question of state liability being resolved against the State.

IT IS SO ORDERED.

## APPENDIX A

| Member of Master's Firm | Type of Work | Hourly Rate |
|---|---|---|
| Daniel R. McCarthy | Professional Services | $125.00 |
| | Administrative Services | 100.00 |
| Philip C. Furber | Professional Services | 75.00 |
| | Administrative Services | 60.00 |
| William P. Gibbons | Professional Services | 100.00 |
| | Administrative Services | 80.00 |
| Stewart I. Mandel | Professional Services | 75.00 |
| | Administrative Services | 60.00 |
| Leonard L. Kleinman | Professional Services | 100.00 |
| | Administrative Services | 80.00 |
| Sheldon M. Sager | Professional Services | 75.00 |
| | Administrative Services | 60.00 |

Table 1.   (Hourly rates, March 1, 1978 to December 31, 1979)

## APPENDIX B

| Member of Master's Firm | Type of Work | Hourly Rate |
|---|---|---|
| Daniel R. McCarthy | Professional Services | $150.00 |
| | Administrative Services | 120.00 |
| Philip C. Furber | Professional Services | 90.00 |
| | Administrative Services | 72.00 |

Table 2.   (Hourly rates January 1, 1980 to August 30, 1980)

## APPENDIX C

| Member of Master's Firm | Type of Work | Hourly Rate | Hours* | Total |
|---|---|---|---|---|
| Daniel R. McCarthy | Professional | $125.00 | 1,302.35 | $162,793.75 |
| | Administrative | 100.00 | 558.15 | 55,815.00 |
| Philip C. Furber | Professional | 75.00 | 732.73 | 54,954.75 |
| | Administrative | 60.00 | 314.03 | 18,841.80 |
| William P. Gibbons | Professional | 100.00 | 35.00 | 3,500.00 |
| | Administrative | 80.00 | 15.00 | 1,200.00 |

record that we did not object to the Special Master's hourly rate at any time.

14. This figure includes $15,525.57 owed to Jones, Day, Reavis and Pogue for representation on the appeal of the earlier award.

| Member of Master's Firm | Type of Work | Hourly Rate | Hours* | Total |
|---|---|---|---|---|
| Stewart I. Mandel | Professional | 75.00 | 5.95 | 446.25 |
| | Administrative | 60.00 | 2.55 | 153.00 |
| Leonard L. Kleinman | Professional | 100.00 | 2.10 | 210.00 |
| | Administrative | 80.00 | 0.90 | 72.00 |
| Sheldon M. Sager | Professional | 75.00 | 1.75 | 131.25 |
| | Administrative | 60.00 | 0.75 | 45.00 |
| | | | | $298,162.80 |

Table 3. (Fees for March 1, 1978 to December 31, 1979)

*Hours spent litigating the award of fees have been subtracted.

## APPENDIX D

| Member of Master's Firm | Type of Work | Hourly Rate | Hours* | Total |
|---|---|---|---|---|
| Daniel R. McCarthy | Professional | $150.00 | 588.53 | $88,279.50 |
| | Administrative | 120.00 | 252.23 | 30,267.60 |
| Philip C. Furber | Professional | 90.00 | 366.28 | 32,965.20 |
| | Administrative | 72.00 | 156.98 | 11,302.56 |
| | | | | $162,814.86 |

Table 4. (Fees for January 1, 1980, to August 30, 1980)

*Hours spent litigating the award of fees have been subtracted.